That leads to our second case, No. 23, 1916, WITRICITY Corporation v. InductEV Inc. Okay, Mr. Vivarelli. Good morning, Your Honors, and may it please the Court. Dan Vivarelli, with Bethel Long on behalf of WITRICITY Corporation, and with me is my colleague, Aaron Camley. There are two issues for appeal here today. The first is the Court should reverse the Board's obvious finding that Stark renders the challenge claims obvious because the Board intentionally ignores portions of Stark that are necessary to understand what it teaches to one of ordinary skill in the art. The second issue is, should the Court reach it, that the Court should reverse and remand because the Board abuses its discretion by failing to consider WITRICITY's SOAR reply argument related to increasing Q, which was a timely argument that flowed from its prior arguments and directly responded to the reply. Is the only obviousness issue on appeal the question of whether a skilled artisan would have been motivated to combine or modify Stark's prototype system with Q values greater than 100? Yes, Your Honor, that is really the issue for appeal. The question of whether the skilled artisan would have appreciated the first six chapters in Stark, the theoretical modeling that he did, and the disclosures with respect to figures 4.3 and 3.9, and implemented them, or it would have been obvious to implement them into the prototype that he built in chapters 7 and 8 of the master's thesis. And our position is it would not because what the Board is affected with... It sounds like a fact issue, and we're not here to find the facts. So why couldn't the Board permissibly reach the conclusion that it did? Because it violated the principles of this Court's decision in Bausch and Rome where it only relied on, it applied the wrong obviousness standard, it only relied on the portions favorable to it, and it ignored everything else about Stark that says that the theoretical modeling does not necessarily work in the real systems that he built. And so it would not be obvious to an ordinary artisan to obtain the Q values. I mean, I understand the question. It's important to understand that Q values are not something that are selected. They're the result of all of the input parameters of the circuit. And so you can't just say that a Q value is, I'm going to put 1,000 in. You have to build a circuit, and you may get a number out. And in fact, if you look at Stark in his conclusions, he only got, notwithstanding his theoretical modeling, he only got to Q values as high as 34. And he said that in his position, the upper limit would be 87. And so it's not obvious to take his theoretical modeling. He said the upper limit would be 87? Where did he say that? He said we're going to be at Appendix 1685, that's Stark 129. Which volume of the appendix is this? That would be the second volume, Your Honor. 1629. 1685, Your Honor. 1685? Correct. This is a long thesis. Okay, so where does he say that the upper limit is 85? Your Honor, in the second paragraph, this yields Q2 equals 87. This is most likely an upper bound to the secondary coil performance. And what he's saying here is when he built the system, he got Q values of 34, and then he did some further analysis and said the maximum that he would obtain is 87. But I thought at least in reading the red brief in footnote 5, I was seeing values higher than 87, at least represented in footnote 5 of the red brief in the Stark. The only values higher than 87 come from any disclosures in the theoretical modeling, which we submit he never could obtain and he says could not be obtained. And so what really is going on is if you look at Figure 4.3, which is the supposed motivation for combining the values in Figure 3.9, 3.9 merely says Q1 equals Q2 equals 1,000. What page of the appendix is Figure 4.3? Figure 4. You tell me to look at Figure 4.3. Sure, sure, sure. 4.3 is appendix 1657 in the same volume. So in Figure 4.3, this is the supposed motivation for including the values in 3.9. And what the board says is that Figure 4.3 represents the fact that there's no theoretical limit to the increasing of values because increasing values increases efficiency. But the problem is that right here in the same page, he also says save for the constraints on Q and the coupling coefficient, which is referred to as K. And so he's saying in a real world system Well, there may be some constraints, but I don't know why 1685 is necessarily saying that 85 is the upper limit in all circumstances as opposed to the upper limit in a particular situation that he's addressing in that paragraph. Did your expert address this language on 1685? I don't believe our expert had to address it because Stark himself addresses it. The answer is he didn't. Look, we're not experts here. I understand. We're not charged with finding the facts, and we have to rely on the record that you made. You're telling me there's no expert testimony supporting the argument that you just made. There's argument that this was Stark's upper limit and that one of ordinary standards. The only reason that the board gets where it is Answer his question directly. Is there no expert testimony supporting the argument that you just made? There is not expert testimony supporting the argument we just made. All right. And so just finishing the thought with respect to 3.9, the fact that the Q1 equals Q2 equals 1,000 is an arbitrary selection that Stark made to generate a pole plot, pole zero plot, when he was attempting to create a geometrical shape. That's your argument, but the board made a fact finding that that's not the case and that the figure with a value of 1,000 could translate into a real-world situation. What are we supposed to do about that? I mean, you come here and you say that's not true, but there's evidence to support what the board said. There's evidence to support what the board said with respect to the fact that, yes, figure 3.9 does include that disclosure, but the remainder of what it says about figure 3.9 should not and could not lead the board to conclude that that is an intended operational specification that could be implemented into Stark's prototype. And that's what the board is ignoring in its decision. It always cites, whenever it discredits one of our arguments, it always cites to the fact that there's no fundamental limit to the increased efficiency. And so what it's really doing is it's only looking at the theoretical modeling that's being done. What is your best support in the record for the argument that you're making? It would be with respect to our contentions, or the board called our contentions 6, 8, and 10, that first of all, that Q1, Q2 equals 1,000 is not an intended operational specification to be put in. Do you have an appendix page that provides your best support in the record for the argument you're making right now? I don't off the top of my head, Your Honor. And so our position is that under the Bausch and Lomb case, when you're looking at a reference, you can't ignore the parts that are teaching what might motivate or what might be a disclosure to end up. And what is going on in Stark in particular in this case is it's taking the theory. I don't see that the board ignored the other part of Stark they talk about. You may not agree with what they said, but they didn't ignore it. Well, our position, Your Honor, is that they do ignore it because they only focus on the statement that there's no fundamental limit to increased efficiency, and they don't ever discuss the real-world constraints that Stark acknowledged and then could not get to a system of greater Q1 or Q2 is greater than 100. And I'd like to briefly also address my argument that the board abuses discretion by failing to consider our certify argument. And it's pretty clear what happened here, in our view, that we, in our patent owner's response, we argued that. In your certify, you didn't provide any additional expert testimony, right? We did not. In fact, we sent it back to our patent owner's response and to the petitioner's reply. And this is on the BEATS point, right? That's correct, Your Honor. Okay. So where did you present evidence that if you had too many BEATS, the system wouldn't work? We repeatedly said it to it in the patent owner's response. You're just relying on Stark. You didn't have any statement by an expert or testimony by an expert that having too many BEATS would result in operability. That's correct. That is not in the record, Your Honor. But Stark himself said that too many BEATS could render the system useless, and that's the point we were making. I don't see that. Where is that at Stark? He starts off by saying that at appendix 1647. What page? 1647, I believe. Let's see. This is where Stark says if you have too many BEATS, it renders the output useless. That's what I just heard you say. So what he says, Your Honor, and what we pointed out in our patent owner's response, is that Stark says that increasing Q could drastically increase the number of BEATS. Okay? And then at... So where does he say an increased number of BEATS would render it inoperable? That would be 1763. He says it increases the number of BEATS. Well, that's not the same thing he's saying. It renders it inoperable. Well, and then at appendix, I believe it was 30 in letter volume, he says they say that you can increase Q. And it's a suitable way to do it. And then at appendix 30, it starts Stark 30 through 33, which is appendix 1586 through 1588. Stark says that there are things that can happen when the energy is being transferred that could render the system useless. And so the point that we were making on server-apply was Stark knew that increasing the number of BEATS, increasing Q would drastically increase the number of BEATS. And he also, and what we said in server-apply is, he also knew that there were energy transfer, things could happen in the energy transfer that could render the system useless. Okay, but you have made the connection where he said that having too many BEATS would render the system useless. I don't see, I don't see the evidence. I don't see that Stark said that. You certainly didn't have any expert testimony, right? We do believe that Stark said it. There is no expert testimony directly on point. That's correct, Your Honor. And then counsel, didn't the board also address the argument to some extent on appendix page 46? Our position there is that is just a conclusory paragraph that is not consistent with what this court expects from in re-invasive. And, you know, the conclusory paragraph effectively says, well, there's no disclosure in Stark that it would, sorry, there's no disclosure in Stark that it would render the system useless. But they don't explain themselves at all either. And then they try to justify it by saying that any disadvantage from drastically increasing the number of BEATS would be a tradeoff with the advantages. And our position there is you have to explain more than that because if the disadvantage is that the prototype would be rendered useless, as Stark knew it could be, then that would not be a tradeoff. That is a useless prototype. What's the best line from Stark that says to us that too many BEATS renders the thing useless? What's the best line? What's the best quotable quote? You have to combine the teachings of 1763 in the appendix, which is Stark 207, with the teachings of pages 30 through 33, which say that when you have these volt output waveforms, the shapes of the output waveforms matter and you can render the system useless.  There is no quotable quote. Why didn't you argue in your patent owner response the very thing that you argued in your surreply? That is that too many BEATS in a waveform renders the output useless. How come you didn't say that part in your patent owner response? Because we took the position that too many BEATS increasing Q, we were talking about the consequences of increasing Q. And one of the consequences was drastically increasing the number of BEATS. And then in response to what the petitioner said in reply, we argued that, well, at a minimum, Stark knew that it could render the system useless as well. And I see that I'm out of my time. I reserve my remaining time for Bill. Well, you don't have any remaining time, but we'll give you a minute. Okay, Mr. Zucker. Okay. Go ahead. Good morning and may it please the court. As your honor has noted, Whytricity's argument here does nothing more than attempt to re-argue the facts that have already been decided by the board, which is inappropriate on substantial evidence review. It's undisputed in this case that Stark discloses a prototype that meets every claim element other than having a quality factor greater than 100. And it's also undisputed that Stark expressly discloses Q factors greater than 100, including Q equal to 1,000 in its earlier chapters. The board therefore found that there would have been a motivation to modify Stark's prototype to use the higher Q values taught in its earlier chapters, and that's supported by substantial evidence, including Stark's express teaching of Q equals 1,000, Stark's statement that higher Q leads to higher energy transfer efficiency, and Stark's express statement that the reader can use the results of the previous chapters to design a coupled resonant system tailored to a specific use. Is your primary alliance for the Q equals 1,000 figure 3 dash 9? That is our primary alliance, but it is not the only one. Stark contains a half dozen additional graphs that discuss Q values greater than 100. Those are collected on page 24 of our red brief. And the corroborating evidence that we submitted also shows that there is nothing new or novel about Q greater than 100. In fact, Dr. Young explains that it has been known for decades to have Q values greater than 100, and in fact some of the supporting evidence here shows that Q values in the tens of thousands or in the 100 thousands were commercially available as far back as 1955. So as Dr. Young testified and the board credited in this case, a skilled artisan would have been able to use the formulas that Stark provides to achieve a desired Q value, including the Q of 1,000 expressly described in Stark, and would have been motivated to do so because increasing Q makes the system transfer energy more efficiently. Under the Intel and DISTAR cases, that's an intrinsic motivation to combine. Even if Stark had said nothing further, that would have been sufficient, that higher Q increases the energy transfer efficiency. But Stark... Is there anything in Stark about this useless argument that opposing counsel made? So the only paragraph in Stark that uses the word useless is from Appendix 1586. This is where they've quoted that word, useless. Excuse me, 1589. And the passage states, As the operating frequency of a circuit increases, this manner of response is critical. If the circuit's response cannot keep up with the frequency of the source drive, its output is useless. So as your honors noted and the board noted, this passage doesn't say anything about having high Q. It doesn't say anything about beats. It's directed to an unrelated idea that if you might have some incompatibility between the frequency of your source drive and the operating frequency of your circuit such that one can't keep up with the other, you could potentially have a useless circuit. But Y-Tricity hasn't presented any expert testimony or any evidence to suggest that the proposed modification would do that here, as the board rightly found. Is there any written testimony or non-expert testimony? There is not. The passage that we just pointed is the only thing that Y-Tricity points to for the argument, and it does not support the idea that high Q would result in a useless system. To that point, your honor, I just want to make clear. Judge Dyke asked my friend on the other side whether he had expert testimony to support this specific argument he was making. They don't have expert testimony to support any of the arguments they're making because the testimony of their expert is not even in the appendix. They admit in their word brief that they are simply not relying on expert testimony at all, and they haven't submitted any before this court. And so under substantial evidence, the board was entitled to look at Stark's expressed disclosure of Q equals 1,000, Stark's statement that the reader should look to previous chapters, and to credit what is Dr. Young's undisputed testimony that a person of ordinary skill would have made this modification. That's reasonable to support the board's findings under a substantial evidence standard. Why did the board initially deny institution? So in its patent owner preliminary response, the patent owner made an argument not supported by expert testimony. They tried to discount figure 3-9 on the idea that figure 3-9 is a mistuned circuit, meaning the primary circuit and the secondary circuit are not tuned to the same frequency. The board accepted that attorney argument, and we moved for rehearing, pointing to the language of Stark and the MATLAB code that generates figure 3-9 to show that that is not true, that figure 3-9 is actually a tuned circuit, and it belongs to the section of Stark that is about tuned circuits. And, in fact, we had addressed this in our expert's declaration that the board had just missed. And the board looked at that and said, you're right, we agree, figure 3-9 is about a tuned circuit, so it is relevant here. And then in their patent owner response, the patent owner dropped any argument that this was a mistuned circuit. They said we're no longer pursuing that. There's some related patents here, right? There are a number of patents related to this one. Not particularly at issue in this case, but yes. Are there IPRs on those too? There are. There were four other IPRs that were fired at the same time of these. All of those have gone final. They were not appealed. There are a number of other IPRs currently pending that don't have final written decisions yet. With overlapping questions to this case? No. The only question for this case is whether there is a motivation to modify Stark's prototype to increase Q greater than 100. None of the other IPRs as currently filed are relying on Stark. So that's a specific question for this case. So you agreed with the question I previously asked opposing counsel, which sounds like you agree that's the only issue for us on appeal. Correct. The only question is whether the board's factual finding that there would be a skill that would have been motivated to modify Stark to have Q greater than 100 is supported by substantial evidence. And then let me clarify for the record, I also recognize there's the question that they raised about the sell-apply and the untimeliness of that argument. But that's the only question that was raised on the obviousness point, right? Correct. That is the only obviousness. I understand there's also a question as to whether the board abused its discretion. If there are no further questions on obviousness, I'll turn to that briefly. The board correctly found that because PatentOwner had not in its PatentOwner's response made this argument that Stark would be useless, it was a new argument, and so correctly rejected it on that basis. But regardless of whether the argument was new or not, this Court can affirm because the board went on to evaluate and reject Whytricity's argument on its merits. Whytricity cited six pages of Stark as supposedly demonstrating that high Q would render Stark's system useless. And the board looked at them and said, quote, We find no indication by Stark at the portions cited by PatentOwner that having Q values of 1,000 would increase the number of beats so high that Stark's system would be rendered useless. That's Appendix 46. So in closing counsel, when I point them to Appendix 46, describe that paragraph as too conclusory and not giving enough information, what is your response? So I disagree. It is only two paragraphs, but there's no reason for it to be longer because what the board says clearly is, Whytricity, you have pointed us to six specific pages for this argument that high Q would generate so many beats the system would be useless. We have looked at those six pages, and they're not there. So the factual contention that Whytricity supposedly relies on is simply not present in the cited pages of Stark, and that's sufficient substantial evidence for the board's decision. The board's not required to further elaborate and further negate a proposition that simply isn't supported by the cited pages. Another argument that I believe was raised in the briefing is about simplifications in the models describing earlier chapters of Stark, and I think they're trying to say that is why Stark might not be able to make certain claims obvious. Can you respond to that in particular? Sure. So the only expert testimony in the record is that a skilled artisan would look at the early chapters of Stark that lay out generalized theory for how a coupled resonant system, and understand that those can, in fact, be applied to Stark's prototype, and that even if they are simplifications, nonetheless, these are teaching generalized concepts such as high Q increases efficiency, and so those concepts are applicable to Stark's prototype. That's what Dr. Young testified, and there's no contrary evidence from Whytricity's expert. Unless your honors have further questions, we would ask the court to affirm. Okay, thank you. Mr. Vivarelli, you've got a minute. Yeah, thank you, your honors. I would just like to address the last point that was just discussed, that there's no contradictory evidence about the simplification with respect to the modeling, and this is in Appendix 30, Decision Quotes, Our Experts' Testimony, which says Whytricity's experts say that it was not easy to model your system and things can get very complicated. So there was Our Experts' Testimony in the record that you can't just take the theoretical models and apply them to the real world systems and ignore all of the constraints of the real world systems that Stark acknowledged existed. Thank you. Okay, thank you. Thank both counsel. The case is submitted.